STATE of Maine

v.

Raymond C. ROLLS.

Supreme Judicial Court of Maine.

July 17, 1978.

Henry N. Berry, III, Dist. Atty., Peter G. Ballou, Deputy Dist. Atty., Stephen Moriarty, Law Student (orally), Portland, for plaintiff.

Ray R. Pallas, Westbrook (orally), for defendant.

Before POMEROY, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

NICHOLS, Justice.

The Defendant, Raymond C. Rolls, waived prosecution by indictment and was charged in a four-count information with burglary with a firearm, gross sexual misconduct, rape, and possession of a firearm by a felon. He was tried by jury in Superior Court in Cumberland County, and was found guilty on each charge. He brings this appeal from the judgment of conviction entered on the verdicts.

We deny the appeal.

The three issues which merit discussion are whether the court erred in admitting a prior consistent statement of the victim; whether the court erred in allowing expert testimony about the percentage of the population possessing a certain combination of blood grouping characteristics; and whether the evidence was sufficient to permit the jury to find beyond a reasonable doubt that it was the Defendant who committed the crimes. These issues arise in the following factual context:

On the night of June 11–12, 1976, a thirteen-year-old girl was awakened by an intruder in her bedroom in her parent's home in Portland's West End. After removing her underwear, the intruder bent over the bed and picked her up. An object, described at trial as an Iver-Johnson .32 caliber

five-shot revolver, fell on the bed and was later recovered.[1]

The victim was carried by the intruder downstairs to a back hall, where the act forming the basis for the charge of gross sexual misconduct was committed under threat of harm to her family. Subsequently, the intruder took the girl outside to an area behind the house. There she was sexually assaulted. Although she did not then know it, she received a laceration in her vaginal area which bled a noticeable amount.

Altogether she was with the intruder for approximately fifty minutes. After he departed, the victim ran upstairs and awoke her parents. They immediately called the police, who arrived within minutes.

The lighting was poor, and she was without her glasses. Her impression of the assailant was, in her word, "blurry." Because of allergies, she was unable to detect any particular odor, such as alcohol, about the person of her assailant. Nevertheless, she was able to describe him as being approximately in his twenties, with long hair, thin, about 5'9" or 5'10" in height, wearing a denim jacket and dark-colored pants which may have been green. This description was immediately broadcast over the police radio. The time was approximately 2:20 a.m.

Approximately one-half hour after the assailant left his victim a Portland police officer in a cruiser observed the Defendant traveling on foot along a street some four to five blocks (approximately ½ mile) from the site of the assault. The Defendant was the only person the officer observed on the street. Since the Defendant appeared to fit the general description broadcast over the radio, the officer asked him to stop and talk, which he did. He was wearing a denim jacket, blue jeans, and western-style boots. It was later shown that his height was about 5'10½" or 5'11", and that he was in his mid-thirties.[2]

The officer noticed that the knees of the Defendant's pants and the tips of his boots were wet, and there was a noticeable odor of alcohol about his person. At the officer's request, the Defendant agreed to accompany the officer to the crime scene. There, he stood under a street light where the victim viewed him from inside the house. She was unable to say any more than that he could have been her assailant.

Although told he was not under arrest, the Defendant was taken to the police station to verify his identity. At the station, the officer first noticed some red stains on the upper right leg of the Defendant's jeans near the zipper. While this particular officer did not touch the pants to determine whether the stains were wet, the police evidence technician testified that the stains were still wet some time later.

It was after the red stains were noticed that the Defendant was formally arrested. He was subjected to a strip search, which revealed he was wearing no underwear. The police were unable to detect anything resembling blood on his person despite a close examination. Nevertheless, the jeans were seized for evidentiary purposes.

The jeans were later sent for analysis of the stains to the F.B.I. laboratory in Washington, where they were examined by Special Agent Robert Spalding. At trial, after establishing his qualifications as a forensic serologist,[3] Agent Spalding testified about his examination of the Defendant's jeans.

After first receiving the pants in June, 1976, Agent Spalding tested them for pur-

---

1. The Defendant asserts that there was insufficient evidence to support a finding that this "object" was in fact a firearm as defined in 17-A M.R.S.A. § 2(12 A). This point is without merit. Not only was there testimony which would support such a finding, but the revolver itself was admitted into evidence and became subject to examination by the jury. *United States v. Samson*, 533 F.2d 721 (1st Cir.) *cert. den.*, 429 U.S. 845, 97 S.Ct. 126, 50 L.Ed.2d 116 (1976).

2. The jury was able to observe the degree to which the Defendant's other characteristics matched the description given by the victim, although such was not articulated in the record.

3. According to the testimony, a forensic serologist works with criminal evidence where blood and body fluids are involved.

poses of determining the presence of blood or semen. These tests were inconclusive on the presence of semen, but did disclose the presence of human blood, which was determined to be of type $A_1$ in the well-known ABO blood-type classification system.

About two months later, a second series of tests was performed on these pants by Agent Spalding. The ABO classification test was repeated to verify the results of the earlier tests, and as a check for any indication of deterioration. A test attempting to classify the stain under the RH system was unsuccessful because of the passage of time. However, Agent Spalding testified that he was able to type the stain according to both the EAP and PGM classification systems.

The erythrocyte acid phosphatase (EAP) and phosphoglucomutage (PGM) blood classifications are based on the presence of enzymes in the blood. These systems are genetically controlled, as in the ABO classification system, and all three are independently inherited, such that the blood type in one system does not depend upon the type in either of the others.

The theory of the PGM system is that there are slight differences between enzyme molecules in the blood. Under certain conditions, these different molecules separate and migrate and can be visually classified by the formation of "banding patterns" in reaction to charging by an electric field (electrophoresis) in a starch gel solution.

The theory of the EAP system is similar except that it involves the use of ultraviolet light rather than an electrical charge. The end result which is subject to typing is again a banding pattern.

In the PGM system, there are three classifications which are normally used: 1–1, 2–1, and 2–2. In the EAP system, there are six classifications: A, B, AB, C, AC, and CB. Agent Spalding testified that type "C" is very rare, and that the letter classifications used in the EAP system are unrelated to those of the ABO system.

From testing the stain on the pants, Agent Spalding determined that the blood was of type 2–1 in the PGM system and BA in the EAP system, in addition to the type $A_1$ in the ABO system noted earlier.

Agent Spalding also performed similar tests on blood samples taken directly from the victim and from the Defendant. The results of the tests performed upon the stains on the pants and the blood from the victim and the Defendant may be summarized as follows:

|           | ABO   | EAP | PGM |
|-----------|-------|-----|-----|
| Pants     | $A_1$ | BA  | 2–1 |
| Victim    | $A_1$ | BA  | 2–1 |
| Defendant | $A_1$ | A   | 1–1 |

Thus, on the basis of these tests, it is evident that the stains on the pants could have been the victim's blood and could not have been the Defendant's.

Agent Spalding was also permitted to testify, without objection, that approximately 35% of the Caucasian population of the United States possess type $A_1$ blood in the ABO classification, that studies done by Scotland Yard reported that approximately 37% of those studied possessed type 2–1 in the PGM group and that research done at the F.B.I. laboratory showed that approximately 39% of the population possess the EAP characteristic BA. He was then asked about how he would, from these three independently obtained figures, determine the percentage of the population that possessed all three of them in their blood. He responded that he would multiply the three figures together to obtain a compound probability.

He was then asked to state the calculation he had performed with the three figures given above. Over objection, and after extensive *voir dire,* the witness was permitted to testify that approximately 5% of the population, or one person in twenty, would possess all three blood characteristics which the victim possessed and which were present in the bloodstain on the Defendant's pants.

When the State had rested, the Defendant testified on his own behalf. He denied any involvement in the crimes. He related

that he had been present at a party in his apartment in Portland that evening, where he had consumed large quantities of alcoholic beverages. At about 11:30 p.m., he said he had escorted one of the guests home and then had escorted her baby-sitter to her home. The two other witnesses presented by the Defendant corroborated his activities up until that time. He related that, at that point, he did not feel like returning home, so he hitch-hiked to Saco where he attempted to work on a car he owned, which was located in Saco. After discovering that he was unable to perform the intended work, he said he hitch-hiked back to Portland and was going home when stopped by the police.

Regarding the blood on his pants, he stated that some of it may have been from cuts he received while working on his car, but that the majority of it was from an occasion sometime in April or May when his girl-friend's daughter cut herself in his presence.

The Defendant admitted he knew blood analysis would be an issue in the trial, but he stated that it had not occurred to him to have the girl's blood analyzed.

### I.

During cross-examination of the victim, counsel for the Defendant elicited testimony that her parents had hired an attorney to "go over" her testimony, and to "reassure" her about it. Subsequently, the State was permitted to introduce into evidence a statement given by the victim to the police shortly after the assault. This was admitted under M.R.Evid. 801(d)(1) as a prior consistent statement to rebut an express or implied charge of recent fabrication or improper influence or motive. While the Defendant did not object to admission of that part of the statement which dealt with identification, he did object to admission of the entire statement. He presses that same point here on appeal.

■ M.R.Evid. 801(d)(1), unlike its Federal counterpart,[4] allows the prior consistent statement of a declarant to be admitted *only* to rebut an express or implied charge of recent fabrication or improper influence or motive. The rationale for this rule is that it allows the trier of fact to consider a statement made prior to the time any improper motive may have arisen, as bearing on the credibility of the testimony given in court.

This rule states the law as it was in Maine prior to the adoption of the Rules of Evidence. See Advisers' Note to M.R.Evid. 801. Field & Murray, *Maine Evidence,* § 801.4 (1976). Under that prior law, " . . . the admissibility of pre-trial statements turns upon the nature and extent of the impeachment efforts, and must be measured by the trial court's discretion." *State v. Lizotte,* Me., 249 A.2d 874, 880 (1969).

In the instant case among the questions asked of the victim on cross-examination were:

Q. Your parents hired an Attorney to go over your testimony and reassure you as to your testimony, is that correct?

　.　　.　　.　　.　　.

Q. And you have gone over that issue of identification with your Attorney, haven't you?

　.　　.　　.　　.　　.

Q. Do you remember you have an allergy now after talking to your Attorney?

■ It was for the presiding justice in the first instance to assess the impact and implication of these questions. The Defendant himself concedes that the portion of the prior statement dealing with the victim's description of, and ability to identify, her assailant was properly admitted. We are unable to conclude on this record that the presiding justice abused his discretion in admitting the entire statement, for

---

4. Rule 801(d)(1)(B), Fed.R.Evid., permits a prior consistent statement to be admitted as substantive evidence of its truth where the declarant testifies at trial or hearing and is subject to cross-examination. See 4 *Weinstein's Evidence,* par. 801(d)(1)(B)[01].

once he determined that the issue of recent fabrication or improper influence or motive had been raised, the contents of the prior statement became a matter of proper inquiry for the jury. See *State v. Franco,* Me., 365 A.2d 807, 812 (1976).

## II.

Prior to the adoption of the Maine Rules of Evidence, there was authority in Maine for the proposition that an expert opinion based on hearsay was as objectionable as hearsay itself. *Brouillette v. Weymouth Shoe Co.,* 157 Me. 143, 170 A.2d 412 (1961). Relying upon this case, the Defendant argues that it was error to permit Agent Spalding to give his opinion that 5% of the population possessed the combination of three blood characteristics possessed by the victim, and found in the bloodstain on the Defendant's pants. The Defendant argues that there was an insufficient foundation to support admission of this testimony because the witness based his opinion on hearsay about the percentage of the population possessing each of the three blood grouping characteristics in issue.

The Defendant's reliance on *Brouillette* is misplaced. A determination of this issue must be made with reference to M.R.Evid. 703, which provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. *If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.* (Emphasis added).

Thus, Rule 703 does not follow *Brouillette.* Rather, it is intended " . . . to bring judicial practice into line with the practice of experts themselves when not in court." Advisers' Note to M.R.Evid. 703. As is stated in the Advisory Committee's Note to Federal Rule 703:

The physician makes life-and-death decisions in reliance upon . . . [matters which would not necessarily be admissi-

ble, at least without time-consuming authentication.] His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.

Another rationale for the rule voiced by some cases is that the expert,

. . . is fully capable of judging for himself what is, or is not, a reliable basis for his opinion. . . . (E)xperience teach[es] the expert to separate the wheat from the chaff and to use only those sources and kinds of information which are of a type reasonably relied upon by similar experts in arriving at sound opinions on the subject.

*United States v. Sims,* 514 F.2d 147, 149 (9th Cir.) *cert. den.* 423 U.S. 845, 96 S.Ct. 83, 46 L.Ed.2d 66 (1975); see also *E. D. Wesley Co. v. City of New Berlin,* 62 Wis.2d 668, 215 N.W.2d 657 (1974); cf. *State v. Clapp,* Me., 335 A.2d 897, 902 (1975).

■ Therefore, as a predicate to admission of expert testimony which is based upon facts or data which are not themselves admissible, the proponent must show that such facts or data are of a type reasonably relied upon by experts in the particular field in forming their opinions.

The scope of the phrase "reasonably relied upon" has caused some fear that enlargement of permissible data may tend to break down unduly the rules of exclusion. See generally 3 Weinstein's Evidence, par. 703[02]; Field & Murray, *Maine Evidence,* § 703.2 (1976). Fairness to litigants, especially to criminal defendants, is a proper concern of courts in the application of rules of evidence to expert testimony. See *State v. Williams,* Me., 388 A.2d 500 (1978) (Nichols, J., concurring).

Since we have not heretofore had occasion to apply Rule 703, we commend the following statement from Field & Murray, *Maine Evidence,* § 703.2, as indicative of the proper scope of the phrase:

. . . (T)he reasonableness of the reliance is a preliminary question for the judge to decide. He is not bound by a statement of the witness that he, or ex-

perts generally, customarily uses such facts or data or finds them reliable in forming opinions. Nor is it enough to show that he relies upon such material only in preparing for litigation; he must establish that experts would act upon it for purposes other than testifying in a lawsuit. The use must be reasonable in the context of a fair administration of the judicial system.

■ Before admitting the witness' testimony, the presiding justice heard evidence from which he could have found as a preliminary fact that the blood grouping surveys from which Agent Spalding drew were of a type which were reasonably relied upon by those in the field. On this record, we are unable to say that there was no proper foundation to support admission of Agent Spalding's testimony. *State v. Ifill,* Me., 349 A.2d 176, 183 (1975); *State v. Clapp, supra,* 335 A.2d at 902. See also *Shanks v. State,* 185 Md. 437, 45 A.2d 85 (1945).

■ The Defendant's objection to this testimony was more properly directed to its weight rather than its admissibility.[5]

### III.

■ The Defendant's final claim of error is that the presiding justice erred in denying his motion for a judgment of acquittal, made at the conclusion of all the evidence, and again after the jury reached its verdict. The sole issue for our review is whether, in view of all the evidence in the case, including reasonable inferences to be drawn therefrom, the jury was warranted in believing beyond a reasonable doubt that the accused was guilty. E. g., *State v. O'Clair,* Me., 292 A.2d 186, 196 (1972). Our limited role in determining the sufficiency of the evidence is essentially the same where the evidence is largely circumstantial in nature. See *State v. Luce,* Me., 384 A.2d 50 (1978).

■ Here the only question is whether the evidence was sufficient to permit the jury to conclude beyond a reasonable doubt that it was this Defendant who committed the crimes. We conclude that it was.

Despite some relatively minor inaccuracies, the Defendant matched the victim's memory of her assailant very closely. The Defendant was stopped within a half mile of the assault not long after it occurred, in the early morning hours when few persons were out and about. He had what proved to be a bloodstain on his pants, which was damp to the touch some time later. The blood on the stain could not have been the Defendant's, and could have been the victim's, and was of a type possessed by approximately 5% to 10% of the population.

The jury was not required to give the Defendant's own story any probative force. His alibi, that he was in Saco, was entirely uncorroborated. While one of his other witnesses did corroborate the Defendant's explanation of the bloodstain, the jury could have fairly concluded that the bloodstain on the Defendant's pants, which was later tested, could not have come from the incident to which the Defendant attributed it, since the alleged incident occurred sometime in April or May. It could hardly have been still damp some time after June 12.

---

**5.** We have examined the record as a whole to determine whether utilization of this evidence was unfair to the Defendant. By order of court, counsel for the Defendant was permitted to propound interrogatories to Agent Spalding concerning the tests he had performed. These interrogatories specifically included a question about the probabilities of two named samples coming from the same person. Thus, the Defendant was in no way surprised by this testimony. Secondly, counsel for the Defendant, in the interrogatories he submitted, as well as at trial, demonstrated considerable fluency in the techniques and theory of blood grouping. The defense, therefore, had adequate ability and opportunity to rebut any possible inaccuracies or inconsistencies in the testimony. Finally, it was at no time suggested to the jury that the 5% figure, or those figures from which it was drawn, were ironclad. Indeed, there was testimony that if each of the underlying figures were off by a factor of ten percentage points, and thus were 45%, 49% and 47% respectively, then about one in ten, or 10% of the population, would possess all three of the characteristics present in the victim's blood and on the Defendant's pants. Therefore, despite the crucial nature of this testimony, the chances that the jury would take it entirely out of perspective were lessened.

In sum, the evidence, although circumstantial, was sufficient to support the jury's finding that it was the Defendant who committed the crimes.

The entry is:

Appeal denied.

Judgment affirmed.

WERNICK, J., did not sit.