COMMONWEALTH vs. LIONEL J. PARADISE, JR.

Worcester. February 7, 1989. — June 14, 1989.

Present: WILKINS, LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Practice, Criminal*, Pretrial conference, Disclosure of evidence, Argument by prosecutor, Request by jury, Questioning of witness by judge. *Evidence*, Failure to produce witness, Statistics, Scientific test, Photograph, Consciousness of guilt.

A criminal defendant demonstrated no prejudice to the preparation and presentation of his case from the prosecutor's delayed disclosure prior to trial of a witness's statement to police. [150-151]

At a criminal trial, the prosecutor's waiver of the right to secure the presence of a witness for cross-examination on the witness's previously transcribed statements, which were introduced in evidence by the defendant with the agreement of the prosecutor, was not a waiver of the prosecution's right to rebut the statement. [151-152]

In a criminal case, there was no merit to the defendant's assertion that the judge should have given a limiting instruction on a portion of the prosecutor's argument to which the defendant had not objected. [152]

At a criminal trial, inferences argued by the prosecutor in his closing were fairly drawn from the evidence. [152-154]

At a criminal trial the judge properly exercised his discretion in refusing to allow the jury to rehear certain testimony. [154-155]

On appeal from murder convictions the defendant did not demonstrate that the jury were exposed to extraneous information not introduced in evidence. [155]

Statistical evidence with respect to blood types and blood enzyme characteristics was properly admitted at a murder trial and, in light of defense counsel's thorough cross-examination and his closing argument, the jury were not in danger of being misled or confused. [155-156]

In a murder case, chemical tests for the presence of blood on the defendant's skin were properly conducted incidental to his arrest and the results were properly ruled admissible as evidence. [156]

At a murder trial photographs of the victims' bodies were properly admitted in the discretion of the trial judge. [156]

No substantial likelihood of a miscarriage of justice was created by a judge's questioning certain witnesses at a murder trial, in light of his careful instructions given to the jury during the trial and in the charge that the source of the questioning did not give greater weight to either the question or the answer. [157]

At a murder trial, a jury instruction on consciousness of guilt was appropriate and correct in substance. [157]

INDICTMENTS found and returned in the Superior Court Department on July 10, 1984.

The cases were tried before *Augustus F. Wagner, Jr.*, J.

*John F. Buckley* for the defendant.

*Katherine E. McMahon*, Assistant District Attorney, for the Commonwealth.

LIACOS, J. The defendant, Lionel J. Paradise, Jr., appeals from his convictions of the murder in the first degree of Angel G. Lawrence and of Lowell Jason Strait.[1] The defendant argues that he was irremediably prejudiced by the Commonwealth's failure to inform him until the eve of trial of the statements of an allegedly exculpatory witness. He claims he is therefore entitled to have the indictments dismissed, or that he should have a new trial. The defendant also claims that the prosecutor improperly rebutted the transcribed statements of the absent exculpatory witness, that the prosecutor's closing argument was improper, and that the judge responded improperly to three questions asked by the jury. He asserts numerous other claims of error. We conclude that there was no error and that this case presents no occasion for us to exercise our extraordinary power under G. L. c. 278, § 33E (1986 ed.). We affirm the defendant's convictions. We summarize the evidence before the jury.

1. *The incident.* Some time after 9:30 P.M. on April 25, 1984, at 14 Maynard Street in Winchendon, April Strait awoke and heard someone coming upstairs where she, her brother and her sister were in bed. April's brother Jason, nicknamed "JJ," was nine years old; April was eleven at the time of trial in November of that year; and April's half-sister, Angel Lawrence, was fifteen. April heard a person entering Angel's bedroom and closing the door. Shortly thereafter, April heard Angel scream, "April, JJ, help me." April also heard Angel

---

[1] The defendant also was convicted of armed assault with intent to murder and assault and battery by means of a dangerous weapon of April L. Strait. These convictions are not before us on appeal. G. L. c. 278, § 33E (1986 ed.).

On the indictments charging murder in the first degree, the jury's verdicts were based on theories of both premeditation and extreme atrocity or cruelty.

say, "What is this, some kind of joke?" April went to her sister's room, opened the door, and saw a man, whose back was toward her, repeatedly stabbing Angel with a knife. April tried to approach the man but twice he pushed her into an open closet where she hit her head on the wall. The man wore a "[y]ellowish, tannish" jacket, which was zipped closed, and he wore "darkish" pants. He had a stocking over his face and head, and he had hair that was "[b]rownish," as well as a moustache, and what April described as a "beard" on the side of his face.

April approached the man a third time. The man stopped stabbing Angel and "went after" April. April grabbed a pillow from Angel's bed and placed it against her stomach. As she retreated, she fell backward. The man began to stab April through the pillow, and April became unconscious. April regained consciousness as the door to Angel's room was being shut. She could hear Angel "mumbling," but could not understand her. April heard the kitchen door shut, and, with some difficulty, she reached the telephone. Angel said, "Don't April. Don't make no phone calls," but April nevertheless tried, unsuccessfully, to telephone her grandmother and a friend. April then lay down again. Angel, meanwhile, was mumbling and banging her head on the wall. At some point, Angel became quiet. April went downstairs and laid down on a couch.[2]

April's mother, Hope Caroline Strait, arrived home shortly after April lay down on the couch, sometime before 1:30 A.M. April told her mother: "A man came and stabbed us . . . [a] man with a stocking over his face." April said that Angel and Jason were upstairs, and that they "got it worse than she did." Hope raced upstairs, did not see anyone, and returned to April. She telephoned the police, her husband, and emergency services, and then, "just froze." Lowell Dean Strait, Hope's husband, arrived first, found Angel and Jason upstairs, and attempted to revive them, without success. April was rushed to a hospital.

---

[2] April remained conscious throughout these events, and she heard and saw only one intruder.

April was in shock; she had suffered facial cuts and blood loss, and she had "a protruding bowel, or intestine, protruding out of [her] shirt." Dr. Edward B. Sussman, a pathologist, described Angel's and Jason's condition. Angel had sustained nineteen "stab and incised wounds" to her head, neck, arms, chest, and abdomen, including several "defense wounds." One of the stab wounds had penetrated Angel's heart, her lungs had collapsed, she showed signs of marked blood loss, and there were signs of asphyxiation. Dr. Sussman observed that Angel's slip "appeared to be ripped off the upper portion" of her body. There was no evidence of seminal fluid. Jason suffered twenty-two "stab and incised" wounds, including nine to his head and six to his chest. One of the stab thrusts to his head had penetrated Jason's skull and his brain. Jason's wounds also included "defense-type" injuries.

2. *Evidence against the defendant.* On April 25, 1984, the defendant, Lionel J. Paradise, Jr., his wife, Carla, and Hope Strait went to the Curve Inn, a local bar featuring "male exotic dancers." Paradise and Carla knew Hope socially. They were neighbors, living within a five-minute walk of each other. Carla often babysat for April and Jason Strait. At the bar, Paradise borrowed some "Salem Light 100's" cigarettes from Hope, and she saw him use his stainless steel cigarette lighter with a unicorn emblem. Paradise wore black slacks and a dark brown jacket with beige sleeves, which he kept zipped closed. At that time, Paradise, whose hair is brown, had long, thick sideburns, described at trial as "mutton-chop sideburns," and a moustache.

At some point after 10 P.M., Paradise asked Hope if he could get cigarettes from her house. Paradise had been in Hope's house on prior occasions, sometimes when Hope and Dean Strait were absent, and Hope gave him permission to get the cigarettes. She also asked if he would "check on [her] kids." Paradise and Carla left at approximately 10:30 P.M.

Paradise and Carla went from the bar to the Straits' house, then picked up their daughter from a babysitter, and, on the way home, stopped by the Straits' house again.[3] Paradise later

---

[3] Carla Paradise testified for the prosecution, waiving her privilege not to testify. She could not testify to any conversations between herself and the defendant in the absence of a third party. G. L. c. 233, § 20.

told a police officer that he had stopped to get another pack of cigarettes. The couple went home, but Paradise left their home again at approximately 10:55 P.M. He returned shortly thereafter. Carla could not recall how long Paradise was gone. When Paradise returned, Carla observed that he had no clothing on above his waist. Paradise went straight to the bathroom, and Carla heard water running. The couple soon went to bed.

At approximately 2:30 A.M., on April 26, 1984, Audrey LaFreniere, Carla's mother, called from the hospital where April Strait had been taken. Paradise answered the telephone and left. Carla did not find out about the events in the Straits' house until later. Paradise picked up Hope's brother, and arrived at the hospital around 4 A.M. Carla's father, Walter La-Freniere, was at the hospital at that time, and he recalled that Paradise then remarked that he must have lost his lighter "stumbling in Mr. Comeau's cellar." Paradise and LaFreniere left the hospital separately at approximately 5 A.M., and went to the latter's home. Paradise asked for another cigarette and stated that he had probably left his cigarettes and lighter on the television in the Straits' house. He added, "Knowing Angel, she probably brought it in her room." Hope later testified that Angel was asthmatic, and could not tolerate cigarette smoke. Paradise left after two cups of coffee and returned to his home at 6 A.M.

Paradise left his house twice more while Carla was at home. On one of these occasions, at approximately 8 A.M., Paradise brought three jackets to a local dry cleaner. One of the jackets was the one Paradise had worn on the night of April 25. Paradise "asked to have them done in a hurry . . . on account of the weather always changing." Paradise then returned home. At approximately 8:20 A.M., the police telephoned and asked him to come to the Winchendon police station. He changed his clothes and left with Carla.

At the police station, Paradise was interviewed by Sergeant Joseph M. Doheny of the State police. Doheny had been informed that another officer had discovered a lighter and a package of cigarettes at the Straits'. When Paradise was asked

about his whereabouts on the evening of April 25, he related the events up to his visit to the Strait house at approximately 10:30 P.M., and he stated that he had left his cigarettes and lighter on the Straits' television set. At that point, Doheny read Paradise the Miranda rights from a card. Paradise signed an affirmation on the card that he understood those rights. He stated that he wished to talk with a police officer; the interview continued. Paradise described his clothing the previous evening, but described his shirt as a "blue and red long-sleeve shirt," whereas Carla later described his shirt as a "sequined shirt." Paradise agreed to produce the clothing he had described, and two police officers accompanied him to his home. Paradise produced some slacks, shoes, and a shirt, and, after a search, he stated, "I think that [the brown and beige jacket] may be one of the jackets I took to the cleaners this morning." Doheny examined the clothing, and he noticed red spots that appeared to be blood on the shoes and on the inside of the pocket of the slacks.

The police officers accompanied Paradise to the dry cleaner and retrieved the jacket. Chemical analysis later revealed that the jacket had traces of human blood on its "tag" and under a "snap" that had not been unfastened prior to cleaning. The officers and Paradise returned to the police station where questioning resumed. When asked how blood came to be on his shoes and slacks, Paradise said, "How the hell do I know?" Doheny asked, "Can you tell me how your lighter and cigarettes got upstairs right by [Angel's] body?" Paradise said, "She probably took them up." When asked, "Why would she do that," Paradise said, "Because her mother always tells her every time me or Carla leaves something, like around the house, to pick it up and hide it." The interview then ceased.

At approximately 11 A.M., Paradise was placed under arrest. The officers and a State chemist took his fingerprints and wiped his hands, forearms, lower legs, and the back of his neck with sterile cotton swabs. The chemist then applied a chemical to the swabs turning them a bright blue color, indicating the presence of blood traces.

Throughout the day and night of April 26, other police officers searched the area around the Strait residence and between that area and Paradise's house. In a nearby parking area where Paradise's automobile was stored, the officers discovered the upper portion of a pair of pantyhose. The pantyhose had blood stains, and hairs that were identified later by a special agent with the Federal Bureau of Investigation as identical to Paradise's hair. In a nearby culvert, the officers discovered a shirt, later identified by Carla Paradise as that worn by the defendant on the evening of April 25. Finally, in a storm drain, the officers located a second shirt, also identified by Carla Paradise as the defendant's. Carla had noticed the absence of both shirts on the morning of April 26. Blood stains on the items of clothing and the pantyhose matched the blood types and the blood enzyme characteristics of each of the victims and of Paradise.

3. *Delayed disclosure of witness.* During their canvassing of the neighborhood on April 26, 1984, two Winchendon police officers, Sergeant Charles N. Leavens, Jr., and Officer Marcel Rougier, interviewed the Straits' immediate neighbors. One neighbor, Gloria Avery, stated that she had seen two men around the Straits' home on the evening of April 25, 1984. Officer Rougier reported this information to Sergeant Doheny, who had recently learned that Paradise had been in the Straits' home that evening, but did not yet consider Paradise a suspect. Doheny told Rougier to return to Avery in order to obtain more information. Rougier did so, he attempted to verify Avery's account by looking out her window and looking for footprints, and he told Doheny that, in his opinion, Avery "was either mistaken or was lying." Doheny was not aware that Rougier had transcribed Avery's statement. Rougier gave that statement to either Sergeant Leavens or the chief of the Winchendon police.[4]

---

[4] Rougier's transcription of Gloria Avery's statement is as follows: "Gloria went to bed at 11:30 P.M. I [*sic*] got up at 11:45 P.M. I stayed up until 3:10 A.M. She saw a small blue car — had two white stripes on both sides. There [were] three male subjects in the vehicle. When I first saw the car, it came down from Mechanic St., then it drove down Maynard St., then

Sergeant Leavens testified that he had placed Avery's statement in a file which he kept labeled "Jason G. Faulkner," another suspect at the time. Leavens did not make clear whether he then knew that Paradise was a suspect. Leavens further testified that he had placed the file in his locker, that nobody had asked him for Avery's statement, and that he "didn't feel [it] was important."

On April 26 or 27, 1984, Sergeant Doheny requested the Winchendon police file on the incident. About one week later, he received materials, including information not only about Paradise but also about the investigation of Faulkner. However, the information about Avery, also in Faulkner's file, was not included. On May 29, 1984, another State trooper, at Doheny's direction, prepared a report which stated that the neighborhood canvass had produced "[n]othing of any evidential value." The defendant claims that he relied on this assertion, and that the failure to produce Avery's statement was a "serious obstacle to the preparation . . . of his defense."[5]

On October 24, 1984, Audrey LaFreniere informed the prosecutor and Doheny that a witness existed whom she could identify only as a woman whose name was probably Mitchell. A person in Doheny's office discovered that Mitchell was Avery's maiden name, and that she had moved to New Hampshire. On November 6, Doheny interviewed her and took her statement.[6] Doheny informed the prosecutor that Avery was a

---

made a right turn onto Spruce Street. I watched the car go all around the block again, and it stopped on Spruce St. I saw two men get out of the car. I saw the two men go behind the Strait's house. I lost view of them for about 20 min. One boy was tall and thin. He had a denham [*sic*] jacket on. The other guy was fat. They walked behind all the houses on this side of the street. I heard the car on Mechanic St. The two boys ran behind my house and that was the last I saw of them. Then I heard the car drive off."

[5] A pretrial conference report, dated August 22, 1984, provided that the Commonwealth would provide the defendant, on or before October 15, 1984, "any facts of an exculpatory nature," and "statements of persons" in the possession of the Commonwealth. See *Commonwealth* v. *Gliniewicz*, 398 Mass. 744, 747 (1986) (written conference report may be the equivalent of discovery order).

[6] The State police transcription of Gloria Avery's statement is as follows:

"Interview of GLORIA JEAN AVERY (nee Mitchell) WF, DOB 12/4/40 of 60 Jackson Ave., Winchendon, MA. by Sgt. Joseph M. Doheny and

witness and that she claimed to have spoken with the Winchendon police. Pursuant to this information, Doheny obtained Leavens's file containing the initial statement from Avery. Subsequent to a pretrial lobby conference on November 7, 1984, the prosecutor stated to defense counsel, "I may have

---

Tpr. Stephen L. Bennett of the State Police on November 6, 1984.

"She stated that on the night of the Strait and Lawrence homicides that her daughter Diana had gone to church with the Strait kids and that at about 9:00PM she was hanging clothes on the line in the backyard and watching for her kids. She noticed a medium blue car, small old car, pull up in front of the Straits and a guy get out and go into the house. A woman remained in the car. She did not know this guy but saw him the next day at 3:00PM in custody of a plain clothes and uniform officer walking up Front St. from Cumberland Farms and go into the Police Station.

"The kids came home at 9:15PM and this car was gone then.

"She saw during the evening that the guy who lived in the stone house (John Elldridge) was sitting on his porch all night drinking beer and smoking pot. At about 10PM or 10:15PM she saw Elldridge walk over to the Strait house.

"Between 11:15PM and 11:20PM her husband came home from work and went directly to bed. She then started getting ready for bed herself.

"At 11:30 she heard screams from outside and after about 5, 6 or 7 minutes she went outside to see where the screams came from. From her backyard she saw two men come across the field from Spruce St. and head toward the rear of the Strait home. These two men climbed on a barrell and up over the railing of the Strait porch. She then returned to the house and looked out her bedroom window. This took about one minute. She was watching for 4-5 minutes when she saw these same two men jump down off the back of the porch to the ground.

"One of these men headed back toward a car parked on Spruce St. with a subject waiting in it. She said this was the same car she had seen earlier at the Strait's house.

"The other man ran toward her backyard and suddenly there were two men running toward her backyard. She has no idea where the second man came from.

"She went out to her backyard and saw both men go by her. The fat one had on a dungaree jacket and dungarees and the other had dungarees and a T-shirt. She cannot further describe or identify these men. They ran around the side of her house.

"They then ran toward the white house across the street (Gemme's house). She also heard the car leave Spruce St. and go around the block screeching tires and brakes. She thinks the car slowed on Mechanic St. and then sped up again, went down Maynard St. and off on Spruce St.

"When asked if one of the men could be the one she saw earlier going into the house, she said yes, and when asked [if] the other man could have been Elldridge she stated yes it could have been."

exculpatory evidence for you." Trial was scheduled for
November 13, 1984. On the afternoon of November 8, defense
counsel received copies of Avery's statements to the Winchen-
don police and to Doheny. Defense counsel sought a hearing
on the alleged prosecutorial misconduct and sought a con-
tinuance. The judge held a hearing on November 13 and 14,
1984, and found that there was no "misconduct whatsoever to
be interpreted under [Mass. R. Crim. P. 14, 378 Mass. 874
(1978)]." The judge continued the case until November 19,
1984.

The defendant argues that the Commonwealth's failure to
disclose Avery's existence until November 8, 1984, eleven
days before the rescheduled trial, prejudiced him by hampering
his trial preparation. The Commonwealth was obligated to
disclose Avery's statements under a pretrial agreement which
the parties agree had the force of a court order. *Commonwealth
v. Gallarelli*, 399 Mass. 17, 20 (1987). The defendant claims
bad faith by the police officers involved as well as by the
prosecutor. In addition, the defendant claimed in argument
before this court that the prejudice to his defense is irremediable
because Avery's memory may fade by the time the defendant
can be retried.

As we stated in *Commonwealth v. Lam Hue To*, 391 Mass.
301, 308 (1984), where there is "an agreement with the force
of a court order to disclose all exculpatory evidence, three
factors are considered in determining whether the prosecutor
violated his constitutional duty in failing to disclose exculpatory
evidence *prior to trial* and whether remedial action is required.
We consider the exculpatory and material nature of the evi-
dence, and whether the delay in disclosing it prejudiced the
defendant" (emphasis supplied). At the outset, we note that
the alleged exculpatory evidence in this case was revealed
*prior* to trial, albeit after the agreed date of October 15, 1984.
In a similar case, we stated: "In determining the consequences
of late disclosure, a court should consider 'whether, given a
timely disclosure, the defense would have been able to prepare
and present its case in such a manner as to create a reasonable
doubt that would not otherwise have existed.' *Commonwealth*

v. *Baldwin*, 385 Mass. 165, 175 (1982), quoting *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980)." *Commonwealth* v. *Cronk*, 396 Mass. 194, 200 (1985). The defendant has failed to establish that the delay in disclosing Avery's statements was prejudicial.

The record shows that counsel for the defendant did not object to the length of the initial continuance. Indeed, it was not until the close of the Commonwealth's case on December 5, 1984 — nearly one month after the defendant was informed of Avery's existence — that defense counsel requested more time. At that point, defense counsel claimed reliance on an alleged promise by the prosecutor, at the pretrial conference for the continuance, to produce Avery for trial. Again, the record contradicts defense counsel's assertions.

At a lobby conference, the prosecutor stated, "As far as I understand . . . she will be available to testify. If [defense counsel] wants to contact her, he can do that. He can have her here any time he so desires to." Nothing prevented the defendant from securing Avery's presence by means of the uniform law to secure the attendance of witnesses from without the State in criminal proceedings. See G. L. c. 233, § 13B (1986 ed.); N.H. Rev. Stat. Ann. §§ 613:1 et seq. (1986). No such effort was made by the defendant. Furthermore, we think it revealing that defense counsel admitted that his investigator had interviewed Avery and had taken her statement on November 16, 1984, and he offered no explanation as to what had happened since that time. In the absence of anything in the record to the contrary, we cannot discount the likelihood that defense counsel preferred to rely on Avery's transcribed statements rather than to rely on her live testimony, especially in light of her apparent reluctance to testify. See *Commonwealth* v. *St. Germain*, 381 Mass. 256, 261-265 (1980) (rejecting claim of prejudice from delayed disclosure of witness's pretrial statement, because defense counsel's decision not to recall witness appeared to be tactical choice).

4. *Commonwealth's rebuttal of Avery's statements.* By agreement between the parties, Avery's transcribed statements were admitted in evidence. The defendant asserts that the Com-

monwealth waived the right to rebut these statements. The record does not support this conclusion. The defendant points to the agreement by the prosecutor at the close of the Commonwealth's case. The prosecutor stated that the Commonwealth would agree to have Avery's statements introduced through the officers who interviewed her, and stated: "The Commonwealth would indicate that if Mrs. Avery had testified in court by way of her actual testimony, or video deposition, that the Commonwealth would then have sought the right to rebut her testimony . . . . In light of the offer [by the defendant to have Avery's statements introduced without her presence] the Commonwealth is waiving its right to cross-examine a defense witness, namely, Mrs. Avery." We cannot read this statement as a waiver of the right to rebut Avery's statements. Such a waiver potentially would encompass the Commonwealth's entire case. Rather, we read the prosecutor's statement as a waiver of the right to insist on securing Avery's presence for purposes of cross-examination.

The defense relied heavily on Avery's statements and told the jury, incorrectly, that she "moved to New Hampshire where she is not subject to service or process to bring her physically before the [c]ourt." The prosecutor in closing argument, pointed to inconsistencies in Avery's statements, and conflicts with other evidence, and he suggested that Avery's "refusal to come in here . . . should weigh heavily on you in deciding whether or not what she said is true or false." There was no objection. In these circumstances, it was within the trial judge's discretion not to give a limiting instruction in response to the prosecutor's comment concerning Avery's nonappearance. *Grady* v. *Collins Transp. Co.*, 341 Mass. 502, 504-506 (1960). The defendant's assertion of error is without merit.

5. *The prosecutor's closing argument.* The defendant maintains on appeal that the prosecutor's closing argument "skillfully implies" a sexual aspect to the incident that is unsupported by the evidence. The prosecutor is entitled to argue the evidence and fair inferences to be drawn therefrom. *Commonwealth* v. *Lamrini*, 392 Mass. 427, 431 (1984), and cases cited. On the record before us, the prosecutor's inferences were fairly drawn.

The prosecutor reviewed the evidence that Angel's brassiere was found on a beanbag chair across the room from her bed and that the brassiere had blood on it of Angel's blood type, whereas there was no blood on the beanbag chair and "no blood on that side of the room from the photographs." The prosecutor then argued, "I submit to you, ladies and gentlemen, the reasonable inference for you to draw is that at the time Angel Lawrence was attacked that that bra was on her body . . . . You can see [from other photographs in evidence] the way her nightgown, or night-shirt was pulled down, and that bra was taken off and thrown to the side and landed there on that beanbag chair." The defendant makes no claim that the photographs depict other than what the prosecutor maintained, or that the photographs are inaccurate. There was no objection, and there is no error.

The prosecutor also recalled that Paradise had stopped by the Strait house twice, once after asking Hope if he could take some cigarettes and clothing and a second time after picking up his daughter from the babysitter. The prosecutor reminded the jury of Paradise's explanation to the police that he stopped by the second time for cigarettes. However, the prosecutor implied that this was not the real reason for Paradise's return, based on Paradise's statement to the police that, when he came into the Strait house, April was dressed for bed and "she had held up an assorted colored knitted afghan in front of her." The prosecutor suggested, "ask yourselves what observations Mr. Paradise made of Angel Lawrence when he went into that house at 10:30 or a quarter of 11:00, and then he had to go back to get another look. And ask yourselves what he's thinking when he goes back to get another look to a point where Angel Lawrence had to put something up in front of her top." The defense objected but was overruled. Finally, the prosecutor suggested that Paradise had "pulled down [Angel's] nightdress and ripped off her bra and threw her bra aside; and she struggled and she screamed, and he had to kill her." There was no objection at this point.

We cannot say that the prosecutor's statements were based on mere conjecture or surmise or that they were cumulatively

improper. Cf. *Commonwealth* v. *Redmond*, 370 Mass. 591, 594-595 (1976) (improper reference to matters not in evidence). The prosecutor's argument did not go beyond "suggestions . . . as to what conclusions the jury should draw from the evidence." *Commonwealth* v. *Ferreira*, 381 Mass. 306, 316 (1980). "In closing argument, counsel may argue the evidence and the fair inferences which can be drawn from the evidence." *Commonwealth* v. *Hoffer*, 375 Mass. 369, 375 (1978). There was no error.

6. *The jury's questions.* On the first day of the jury's deliberations, they returned with three questions: "[1] How much money on defendant at the time of arrest?" "[2] Can we have Bridgewater reports?" "[3] Can we have some information on time of death?" As to questions 1 and 3, the judge instructed the jury that they had to recall the evidence and that "I am not going to give you any additional information at this point in time." As to question 2, the judge instructed that "there are no Bridgewater reports in evidence and you are not permitted to have any reports at this point in time. You are restricted to the evidence that is before you and nothing more. You are not to speculate, conjecture or surmise, but you will recall the evidence in the case."

a. *Review of testimony.* The defendant claims that the judge erred by not allowing the jury to rehear portions of the testimony relative to questions 1 and 3. The defendant claims that the judge either was unaware of his discretion to permit the jury to repeat witness testimony, *Commonwealth* v. *Mandeville*, 386 Mass. 393, 405 (1982), or that he abused his discretion. The record suggests otherwise.

At the outset of the trial, the judge instructed the jury that, in his discretion, he would not permit them to take notes, in part so that the jury would not give too much weight to certain evidence. We consider this in conjunction with the judge's response at the time of the jury's request, quoted above. "We find no indication that the judge was unaware of his discretion in this matter. The record reflects that he preferred that the jury's collective memory should govern . . . . We therefore

conclude that the judge acted within his discretion in refusing the jury's request." *Commonwealth* v. *Richenburg*, 401 Mass. 663, 675-676 (1988).

b. *Bridgewater reports.* The defendant claims that the jury's request for Bridgewater reports reveals that the jury had been exposed to news media or other extraneous matter not introduced in evidence. The Commonwealth does not contend that there was any reference to such reports properly before the jury. However, the defendant "bears the burden of demonstrating that the jury were in fact exposed to the extraneous matter." *Commonwealth* v. *Fidler*, 377 Mass. 192, 201 (1979). The defendant failed to object or to bring the matter to the judge's attention. There is nothing in the record to indicate that the jury's question was based on anything other than conjecture or surmise. The judge's response to the jury's question was appropriate, and it is not challenged. There was no error.

7. *Statistical evidence.* The Commonwewalth introduced the testimony of Robert W. Hall, a special agent and serologist with the Federal Bureau of Investigation, which connected the blood types and the enzyme characteristics of the blood found on physical evidence to blood samples from the defendant and the victims. Hall testified at length, on direct and cross-examination, as to his testing methodology and its accuracy.[7] Hall carefully limited his testimony to say only that the blood samples from the evidence were "consistent" with the blood of the defendant or the victims.

However, Hall estimated, on the basis of various studies of from 1,200 to 56,000 people, that "[b]etween one and two out of ten thousand people" would have the same blood characteristics as the defendant for all of the twelve or more characteristics tested. In summarizing this testimony, Hall compared the accuracy of his tests with that of "the Gallup Polls, where maybe five thousand people are sampled and from those five thousand people projections and predictions can be made with a great

---

[7] Agent Hall based his testimony on the use of the electrophoretic process which we approved and described extensively in *Commonwealth* v. *Gomes*, 403 Mass. 258, 265-273 (1988).

deal of accuracy." Defense counsel did not object; instead he asked if Hall's tests were as accurate as "the Dewey-Truman survey poll."

We have recently upheld the admission of similarly well-grounded and carefully explained statistical evidence. *Commonwealth* v. *Gomes*, 403 Mass. 258, 273-275 (1988). We are cognizant of the dangers of such evidence. See *id*. For example, Hall did not appear to adjust his figure of one or two in 10,000 to account for the inconclusive results as to some of the characteristics when testing certain physical evidence. There was no objection on this point. In light of defense counsel's thorough cross-examination and his closing argument on the accuracy of the statistical evidence, we conclude that the jury were not in danger of being misled or confused.[8] See *Commonwealth* v. *Drayton*, 386 Mass. 39, 50-51 (1982) (potentially misleading statistical evidence was harmless error).

8. *Other issues*. a. *Chemical tests on the defendant's body*. The defendant asserts that the judge should have excluded the results of the test conducted on the defendant's body with cotton swabs for the presence of blood, because it was conducted without a warrant. We have already upheld such testing incidental to a lawful arrest. *Commonwealth* v. *Appleby*, 358 Mass. 407, 412-413 (1970). The defendant makes no claim that his arrest was unlawful, and we see no reason to disturb our prior holding.

b. *Photographs of victims*. The defendant claims that the admission of photographs of the victims was error. The defendant does not dispute that the photographs were relevant on the issue of extreme atrocity or cruelty, *Commonwealth* v. *Allen*, 395 Mass. 448, 459 (1985), but he claims that they were cumulative of the Commonwealth's expert testimony about the nature and extent of the victims' injuries. The admission of such photographs is within the sound discretion of the judge. *Commonwealth* v. *Richenburg*, 401 Mass. 663, 672 (1988). There was no abuse of discretion.

---

[8] We also note that the defendant does not argue that the judge should have given a cautionary charge on this point.

c. *The judge's questioning of witnesses.* The defense complains that the judge asked questions of some witnesses and, allegedly, revealed bias. A trial judge is empowered to question witnesses in order to clarify an issue, to prevent perjury, or to develop trustworthy testimony. *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 846-847 (1980). Furthermore, there was no objection at trial. We have recognized that the "failure to make repeated objections to the judge's conduct is not fatal on appeal. A litigant is not forced to choose between minimizing the effect of improper judicial conduct at trial and preserving full and thorough review." *Kuczynski* v. *Alfano*, 402 Mass. 1001 (1988). However, the total absence of objection "cannot be ignored," and we therefore review only for a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Fitzgerald*, *supra* at 849. The judge carefully instructed, both during trial and in the jury charge, that the mere fact that he asked questions of certain witnesses did not give any greater weight to either the question or the answer. We have considered each of the instances in the transcript of which the defendant complains, and we consider the defendant's assertions of error to be entirely without merit.

d. *Consciousness of guilt.* The judge instructed the jury as to consciousness of guilt in accordance with our decision in *Commonwealth* v. *Toney*, 385 Mass. 575, 585 (1982). The defendant asserts, inter alia, that the charge should not have been given and also that it did not go far enough. The various actions and statements of the defendant, already recited, made it appropriate to charge the jury on this issue, e.g., hiding his clothing, taking his jacket to the cleaners, his change of hairstyle, moustache, and sideburns before trial. *Id.* at 584-585 & nn.4 & 6. The charge given was correct in substance, and absent any specific requests to supplement it, the defendant cannot now argue a new theory on appeal. *Commonwealth* v. *Clark*, 378 Mass. 392, 397 (1979).

9. *Review under G. L. c. 278, § 33E.* We have examined the record and have discovered no basis for concluding either that there was error or that we should reduce the defendant's convictions. *Commonwealth* v. *Mahdi*, 388 Mass. 679, 690

(1983), and cases cited. The defendant's core argument to the jury, that a person other than the defendant might have had the opportunity to commit the crimes charged, goes only to the weight of the evidence and is, in any event, unpersuasive on this record. *Commonwealth* v. *Lussier*, 364 Mass. 414, 421 (1973). The evidence against the defendant and the evidence of premeditation and of cruelty or atrocity were overwhelming. *Commonwealth* v. *Basch*, 386 Mass. 620, 622 (1982). *Commonwealth* v. *Golston*, 373 Mass. 249, 260 (1977), cert. denied, 434 U. S. 1039 (1978).

*Judgments affirmed.*